| | |
|---|---|
| STEVEN IANUZZI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 07-109 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. Introduction

Plaintiff, Steven Ianuzzi, seeks judicial review of a

decision of Defendant, Commissioner of Social Security

("Commissioner"), denying his applications for disability

insurance benefits ("DIB") and supplemental security income

("SSI") under Titles II and XVI, respectively, of the Social

Security Act, 42 U.S.C. §§ 401-433 and §§ 1381-1383f. Presently

before the Court are the parties' cross-motions for summary

judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth

below, Plaintiff's motion for summary judgment will be denied and

the Commissioner's cross-motion for summary judgment will be

granted.

## II. Background

### A. Procedural History

Plaintiff filed applications for DIB and SSI on July 14, 2005 and September 22, 2005, respectively, alleging disability since March 15, 2005 due to chronic neck and back pain and headaches. (R. 59-61, 77, 394-96). Following the denial of his applications, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. 50-51). At the hearing, which was held on November 17, 2006, Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified. (R. 413-72).

On February 14, 2007, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI, concluding that Plaintiff retained the residual functional capacity ("RFC") to perform past relevant work.[1] (R. 13-19). Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on May 3, 2007. (R. 5-7). This appeal followed.

### B. Personal History

Plaintiff's date of birth is October 11, 1956, and he is a high school graduate. (R. 419-20). At the time of the hearing before the ALJ, Plaintiff was divorced and living alone in an apartment, and his only child, a daughter, was 26 years old. (R.

---

[1]The Social Security Regulations define RFC as the *most* a claimant can still do despite his or her limitations. *See* 20 C.F.R. §§ 404.1545 and 416.945.

2

421-22).

With respect to medical history, Plaintiff suffers from diabetes,[2] and he has been prescribed medication by his family physician for anxiety. In May 2003, Plaintiff sustained injuries to his neck and back in a motor vehicle accident in Virginia;[3] in September 2005, Plaintiff suffered a heart attack; and in September 2006, Plaintiff underwent surgery for a blood clot in his left leg. (R. 428, 433-37, 443).

Regarding past employment, from 1974 to 1993, Plaintiff owned and operated a plumbing, sewer and drain cleaning business; from 1994 to 1999, Plaintiff worked as a sales representative for a car dealership; from 1999 to 2000, Plaintiff worked as a commercial accounts manager for a plumbing and heating company; from 2000 to April 2004, Plaintiff worked as a finance and insurance manager for several car dealerships; and from October 2004 until his alleged onset of disability in March 2005, Plaintiff worked as a commercial accounts manager for a car dealership. (R. 77-78).

---

[2]During the hearing before the ALJ, Plaintiff testified that he was initially diagnosed with diabetes in 1994. (R. 436).

[3]During the hearing before the ALJ, Plaintiff testified that he had a personal injury action pending against the driver of the other vehicle involved in the accident, and that a court proceeding was scheduled in May 2007 in Newport News, Virginia. (R. 423-24).

3

## C. Vocational Expert Testimony

At the hearing on Plaintiff's applications for DIB and SSI, the ALJ initially asked the VE to classify Plaintiff's past work. The VE testified that Plaintiff's job as a sewer and drain cleaner was medium, semi-skilled work; his job as an automobile sales representative was light, skilled work; and his job as a credit manager was sedentary, skilled work.[4] (R. 460-61).

The ALJ then asked the VE to assume a hypothetical individual of Plaintiff's age, education and work experience who is limited to performing work at the medium exertion level with the following restrictions: (1) no more than occasional balancing and crouching; (2) no crawling or climbing ropes, ladders and scaffolding; (3) no more than occasional overhead reaching; and (4) no prolonged exposure to extreme cold temperatures or extreme wetness or humidity. When asked whether the hypothetical individual could perform any of the jobs that Plaintiff performed

---

[4]**Medium** work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. **Light** work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. **Sedentary** work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. *See* 20 C.F.R. §§ 404.1567 and 416.967.

in the past, the VE testified that the hypothetical individual could perform Plaintiff's past work as an automobile sales representative and a credit manager. The VE ruled out Plaintiff's past work as a sewer and drain cleaner, however, due to the postural activities required to perform this work. (R. 462-63).

Next, the ALJ asked the VE whether there were any jobs that the hypothetical individual could perform if he could not perform any of Plaintiff's past work. The VE responded affirmatively, identifying the medium exertion level jobs of hand packer and cashier, the light exertion level jobs of office helper and hostess/greeter, and the sedentary exertion level jobs of surveillance system monitor and credit reference clerk (with a sit/stand option). (R. 463-65).

Finally, the ALJ asked the VE to define competitive employment, and he responded: eight hours a day, five days a week with no more than one absence per month, two fifteen-minute breaks and a half hour for lunch and the ability to stay on task 85-90% of the workday. (R. 465-66).

## D. Medical Evidence

On March 15, 2005, Plaintiff was treated by Dr. John F. Reinhardt, his family physician, for a complaint of headaches. Noting Plaintiff's history of chronic back pain following a motor vehicle accident in 2003, Dr. Reinhardt prescribed Vicodin for

5

Plaintiff's headaches and ordered an MRI of Plaintiff's head.[5]
(R. 221).

During his follow-up visit with Dr. Reinhardt on March 28,
2005, Plaintiff continued to complain of constant headaches. Dr.
Reinhardt's assessment was headaches, degenerative joint disease
of the neck and possible whiplash. He prescribed Doxepin for
Plaintiff,[6] scheduled an MRI of Plaintiff's cervical spine for
March 31, 2005, and referred Plaintiff for physical therapy. (R.
220). Plaintiff was evaluated that day at the Drayer Physical
Therapy Institute. The evaluator's assessment was (1) Paraspinal
cervical muscle spasm, (2) Headaches and (3) Decreased sub
occipital mobility. Plaintiff's physical therapy plan included
cervical spine mobility, myofascial pain management and
modalities such as ultrasound, moist heat and electrical
stimulation for muscle spasm and pain. (R. 351-52, 362).

The MRI of Plaintiff's cervical spine on March 31, 2005
showed degenerative disc changes at multiple levels, most severe
at C5-6 and C6-7. (R. 228-29). On April 27, 2005, Plaintiff saw
Dr. Reinhardt for a follow-up visit and to get papers completed
for an insurance company. Dr. Reinhardt's assessment was

---

[5]Vicodin is a combination of drugs used to relieve moderate
to moderately severe pain. www.nlm.nih.gov/medlineplus/druginfo
(last visited 4/17/2008).

[6]Doxepin is used to treat depression and anxiety.
www.nlm.nih.gov/medlineplus/druginfo (last visited 4/17/2008).

6

whiplash, headaches and degenerative joint disease, and he
indicated that Plaintiff would be referred to Dr. James Burke for
pain management. (R. 219).

Plaintiff was evaluated by Dr. Burke of Allegheny Brain and
Spine Surgeons on May 10, 2005 for his complaint of daily
headaches since March 2005. At the time, Plaintiff's medications
included Amaryl, Doxepin and Vicodin.[7] Plaintiff's neurologic
examination was unremarkable; however, Dr. Burke noted that
Plaintiff had radiographic evidence of degenerative disc disease
of the cervical spine. Dr. Burke also noted that Plaintiff
appeared to be symptomatic for occipital neuralgia.[8] Dr. Burke
referred Plaintiff to Dr. John Johnson, an anesthesiologist, for
trigger point injections. Dr. Burke also recommended that
Plaintiff take 800 mgs. of ibuprofen to alleviate his headaches,[9]

---

[7]Amaryl is used with diet and exercise to treat type 2
diabetes (a condition in which the body does not use insulin
normally and therefore cannot control the amount of sugar in the
blood). www.nlm.nih.gov/medlineplus/druginfo (last visited
4/17/2008).

[8]Occipital neuralgia is a distinct type of headache
characterized by piercing, throbbing or electric-shock-like
chronic pain in the upper neck, back of the head, and behind the
ears, usually on one side of the head. Typically, the pain of
occipital neuralgia begins in the neck and then spreads upwards.
Treatment is generally symptomatic and includes massage and rest.
In some cases, antidepressants may be used when the pain is
particularly severe. Other treatments include local nerve blocks
and injections of steroids directly into the affected area. www.
ninds.nih.gov/disorders (last visited 4/18/2008).

[9]Nonprescription ibuprofen is used to reduce fevers and to
relieve mild pain from headaches, muscle aches, arthritis,

7

and he gave Plaintiff samples of a muscle relaxant. (R. 184-85).

A report from the Drayer Physical Therapy Institute regarding an evaluation of Plaintiff on May 16, 2005 indicates that he had progressed slowly with physical therapy. Plaintiff rated the intensity of his pain as 1 or 2 levels lower compared to his initial evaluation. Plaintiff also reported a decrease in the frequency of his headaches. The evaluator indicated that Plaintiff would benefit from continued physical therapy, and that Plaintiff would attend physical therapy three times a week for an additional four to six weeks. (R. 349-50).

On May 31, 2005, Plaintiff was evaluated by Dr. Johnson for headaches. After performing a physical examination of Plaintiff, Dr. Johnson's primary diagnoses were (1) Bilateral occipital neuralgia, (2) Myofascial pain[10] and (3) Cervical and lumbar

---

menstrual periods, the common cold, toothaches and backaches. www.nlm.nih.gov/medlineplus/druginfo (last visited 4/18/2008).

[10]Myofascial pain syndrome is a chronic local or regional musculoskeletal pain disorder that may involve either a single muscle or a muscle group. The pain may be of a burning, stabbing, aching or nagging quality. The pathophysiology of myofascial pain is somewhat of a mystery due to limited clinical research; however, based on case reports and medical observation, investigators think it may develop from a muscle lesion or excessive strain on a particular muscle or muscle group, ligament or tendon. It is thought that the lesion or the strain prompts the development of a "trigger point" that, in turn, causes pain. In addition to the local or regional pain, people with myofascial pain syndrome also can suffer from depression, fatigue and behavioral disturbances, as with all chronic pain conditions. (Beth Israel Medical Center, Dept. of Pain Medicine and Palliative Care) www.stoppain.org/pain (last visited 4/18/2008).

radiculitis.[11]   Dr. Johnson administered two trigger point

injections to Plaintiff in the paracervical musculature, one each

bilaterally, as well as bilateral greater and lesser occipital

nerve blocks.   Plaintiff tolerated the procedures well and was

discharged in good condition.   (R. 266-69, 271-72).

   Plaintiff was re-evaluated by Dr. Johnson on June 21, 2005.

Plaintiff reported some reduction in his overall pain

symptomatology for several days following the trigger point

injections and occipital nerve blocks.   However, the headaches

had returned to their baseline frequency and intensity.   Dr.

Johnson administered repeat bilateral occipital nerve blocks

---

[11]Individuals suffering from radiculitis report pain that
radiates along a nerve path because of pressure on the nerve root
where it connects to the spine.   The location and type of pain
depends on the area of the spine where the compression occurs.
For instance, radiculitis in the cervical spine may cause pain in
the neck or radiate down the arm.   If located in the thoracic
spine, radiculitis may cause pain in the chest area.   The most
common complaint, however, is in the lower or lumbar area, with
pain in the hips, legs and feet.   www.spinaldisorders.com (last
visited 4/18/2008).   With respect to Plaintiff's lumbar
radiculitis, in December 2003, Dr. Michael J. Barnum, an
orthopedic specialist, evaluated Plaintiff for complaints of low
back pain since the automobile accident in May 2003, noting that
x-rays of Plaintiff's lumbar spine showed severe degenerative
disc disease with facet arthrosis and anterior osteophyte
formation.   (R. 159-60).   This diagnosis was confirmed by studies
of Plaintiff's lumbar spine in February 2004, which showed a disc
herniation at L5-S1 and multiple disc protrusions and
osteophytes.   (R. 161-66).   During a follow-up visit with Dr.
Barnum in April 2004, Plaintiff reported feeling 95% improved
following a lumbar epidural steroid injection by Dr. Martin V.
Ton on March 18, 2004, and Dr. Barnum described Plaintiff as
being "at a point of maximum medical improvement."   (R. 140-42,
156-57).

9

without difficulty. (R. 262-65).

Plaintiff's next appointment with Dr. Johnson took place on July 12, 2005. Plaintiff reported approximately two days' relief from his headaches following the repeat nerve blocks on June 21, 2005. However, the headaches had returned to their baseline. In addition, Plaintiff reported low back discomfort that was aggravated by prolonged sitting and standing. Plaintiff rated his pain an 8 on a scale of 0 to 10. Because of Plaintiff's marginal response to the occipital nerve blocks, a cervical epidural steroid injection was administered by Dr. Johnson without difficulty. (R. 259-61).

During a follow-up visit with Dr. Johnson on July 26, 2005, Plaintiff reported that his headaches had decreased in intensity; however, the headaches remained the same with respect to frequency. Plaintiff rated his pain a 3 or 4. Plaintiff reported feeling much improved overall, indicating that the cervical epidural steroid injection reduced his pain much more than the occipital nerve blocks. Dr. Johnson offered Plaintiff a repeat cervical epidural steroid injection which was administered without difficulty. (R. 254-57).

Plaintiff returned to Dr. Burke for a follow-up visit on August 2, 2005. Plaintiff continued to complain of headaches, reporting that he was experiencing blurred vision with his headaches; that light bothered his eyes during the headaches and

10

that he occasionally experienced dizziness. Noting that
Plaintiff had received trigger point injections, occipital nerve
blocks and cervical epidural steroid injections from Dr. Johnson,
Dr. Burke indicated that Plaintiff appeared to be symptomatic
from occipital neuralgia and whiplash syndrome. Dr. Burke also
indicated that Plaintiff would be referred for a neurological
evaluation of his headaches. (R. 182-83).

Plaintiff returned to Dr. Johnson for a follow-up visit on
August 9, 2005. Plaintiff's primary complaint at that time was
neck pain and headaches, although he continued to suffer from low
back pain. Plaintiff reported difficulty sleeping and rated his
pain an 8. Dr. Johnson administered a repeat cervical epidural
steroid injection, and he prescribed Percocet and Elavil for
Plaintiff in an attempt to reduce his overall pain and help his
poor sleep pattern.[12] (R. 250-53).

Plaintiff saw Dr. Reinhardt on August 12, 2005 for
complaints of very high blood sugar levels, dizziness and blurred
vision. Dr. Reinhardt prescribed Novolog for Plaintiff.[13] (R.
218). Plaintiff saw Dr. Reinhardt for a follow-up visit for his

---

[12]Percocet is used to relieve moderate to moderate-to-severe
pain, and Elavil (Amitriptyline) is used to treat symptoms of
depression. www.nlm.nih.gov/medlineplus/druginfo (last visited
4/18/2008).

[13]Novolog (insulin) is a solution that is injected under the
skin. It is used to treat people with type 2 diabetes that
cannot be controlled with oral medications alone. www.nlm.nih.
gov/medlineplus/druginfo (last visited 4/17/2008).

11

out of control diabetes on August 15, 2005. (R. 217).

On September 9, 2005, Plaintiff presented to the Emergency Department of Altoona Regional Hospital with an acute inferoposterior myocardial infarction, and he was referred for cardiac catheterization. After the diagnostic angiogram was completed, Dr. Mukul Bhatnagar performed an angioplasty and placed a stent in Plaintiff's right coronary artery. He was discharged on September 13, 2005. (R. 186-94). Plaintiff saw Dr. Reinhardt for a follow-up visit with respect to his heart attack on September 21, 2005. Dr. Reinhardt described Plaintiff as "doing good." (R. 216).

On September 20, 2005, Plaintiff was evaluated by Dr. Zhenhul Li, a neurologist, for his complaint of daily headaches. Plaintiff reported that the headaches started in March 2005, were gradually getting worse and were associated with nausea, blurred vision, double vision and reduced concentration. After examining Plaintiff, Dr. Li's impression was migraine headaches, cervical radiculopathy and neck pain. Dr. Li prescribed Topamax and Fioricet for Plaintiff.[14] At the time, Plaintiff also was taking Plavix, aspirin, Lipitor, Percocet, Doxepin and insulin.[15]

---

[14]Topamax is used to prevent migraine headaches, but not to relieve the pain of migraine headaches when they occur. Fioricet is a combination of drugs used to relieve tension headaches. www.nlm.nih.gov/medlineplus/druginfo (last visited 4/17/2008).

[15]Plavix is used to prevent strokes and heart attacks in patients at risk for these problems; Nonprescription aspirin is

12

On October 11, 2005, Plaintiff saw Dr. Bhatnagar to follow-up on his cardiac status and medications. Plaintiff denied any recent chest pain and reported that he was tolerating his medications well. Plaintiff also reported that he had been "reasonably active." Dr. Bhatnagar described Plaintiff's cardiac status as stable and his angina as controlled, indicating that Plaintiff would participate in a cardiac rehabilitation program. (R. 240).

On October 17, 2005, Plaintiff returned to the Drayer Physical Therapy Institute for treatment. Plaintiff reported constant and intermittently intense headaches and sensitivity to light. With respect to his observation of Plaintiff, the evaluator stated: "This patient presents with no observable objective findings upon visual inspection. His general affect and presentation are of sullen nature and his eyes appear to be indicative of chronic fatigue." The evaluator's list of Plaintiff's problems included pain, decreased cervical range of motion and headaches. Plaintiff's treatment plan included "[m]anual therapy, soft tissue mobilization in the sub occipital region as well as pain management via modalities including moist

used to prevent heart attacks in people who have had a heart attack in the past or who have angina (chest pain that occurs when the heart does not get enough oxygen); and Lipitor is used together with lifestyle changes (diet, weight loss, exercise) to reduce the amount of cholesterol (a fat-like substance) and other fatty substances in the blood. www.nlm.nih.gov/medlineplus/druginfo (last visited 4/17/2008).

heat, stim and ultrasound."[16]  (R. 290-91).

Plaintiff returned to Dr. Johnson on October 20, 2005. Because Plavix had been prescribed for Plaintiff following his heart attack, Dr. Johnson noted that further injection therapy was contraindicated at that time.  Plaintiff rated his pain as 6 to 8, indicating that he was taking Percocet to help reduce his overall pain symptomatology.  Dr. Johnson indicated that he would re-initiate treatment with cervical epidural steroid injections and/or greater occipital nerve blocks when Plaintiff was able to stop taking Plavix for five days.  (R. 247-49).

Plaintiff's next appointment with Dr. Johnson took place on November 22, 2005.  Plaintiff continued to complain of neck and low back pain and headaches, indicating that the pain was moderately controlled with Percocet.  Plaintiff rated his pain that day as 7 or 8.  Due to Plaintiff's continued use of Plavix, injection therapy could not be re-initiated at that time.  (R. 244-46).  The situation remained the same at the time of Plaintiff's next appointment with Dr. Johnson on December 21, 2005.  (R. 241-42).

On February 2, 2006, Dr. Elizabeth Dunmore evaluated Plaintiff for his complaints of headaches and chronic neck and back pain.  The evaluation was performed at the request of the

_____

[16]The frequency and duration of Plaintiff's physical therapy was to be 3 times a week for 6 weeks.

14

Pennsylvania Bureau of Disability Determination. Dr. Dunmore's report indicates that her neurologic examination of Plaintiff revealed 5/5 strength in all tested areas. In addition, Plaintiff's reflexes were 2+ and symmetrical. Plaintiff reported using a cane to ambulate because his legs occasionally "give out" and he falls. Plaintiff was able to ambulate without the cane, but his gait was stiff and slow. Dr. Dunmore's impression was (1) Chronic pain syndrome (noting that Plaintiff has severe subjective pain with minimal objective findings), (2) Coronary artery disease (with no ongoing symptoms of active angina or congestive heart failure), and (3) Diabetes (reasonably well controlled). (R. 363-65). With respect to Dr. Dunmore's Medical Source Statement of Plaintiff's ability to perform work-related physical activities, she opined that Plaintiff could occasionally lift and carry 10 pounds; that he could stand and walk 1 to 2 hours in an 8-hour workday; that he had no limitation on his ability to sit or push and pull with his upper and lower extremities; and that he could never balance or climb. (R. 367-68).

On March 27, 2006, a non-examining State agency medical consultant completed a Physical RFC Assessment for Plaintiff. With respect to exertional limitations, the consultant opined that Plaintiff could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; that he could stand and/or

15

walk 6 hours in an 8-hour workday; that he could sit about 6
hours in an 8-hour workday; and that he had no limitations in his
ability to push and pull with his upper and lower extremities.
The consultant further opined that Plaintiff had no postural,
manipulative, visual, communicative or environmental limitations.
(R. 369-78).

On July 20, 2006, Dr. Johnson completed a medical evaluation
of Plaintiff, which apparently had been requested by Plaintiff's
attorney for submission to the Social Security Administration.[17]
In the report, Dr. Johnson indicates that he first saw Plaintiff
on May 31, 2005 and that he last saw Plaintiff that day. Dr.
Johnson listed Plaintiff's impairments as "occipital headaches 2-

_____

[17]The evaluation form which had been provided to Dr. Johnson
by counsel was a form utilized for mental health evaluations,
rather than physical evaluations. In fact, the words "Mental
Health" which were set forth in parentheses following the caption
of the form, "Medical Evaluation," were crossed out. As a
result, the form requested Dr. Johnson's opinion regarding the
extent of Plaintiff's limitations with respect to activities of
daily living, maintaining social functioning, deficiencies of
concentration, episodes of decompensation in work or work-like
settings, ability to respond appropriately to co-workers,
supervisors or the public, ability to engage in sustained work
(undefined) and ability to deal with stress, rather than
Plaintiff's ability to engage in work-related physical activities
such as lifting/carrying, standing/walking, sitting, pushing and
pulling. In any event, Dr. Johnson indicated that Plaintiff was
markedly limited in activities of daily living, social
functioning, the ability to engage in sustained work and the
ability to deal with stress, but that he was unable to evaluate
Plaintiff's deficiencies of concentration, episodes of
decompensation in work or work-like settings and ability to
respond appropriately to co-workers, supervisors or the public.
(R. 379-83).

16

3x's/day - pain radiates to shoulders, back pain, neck pain."[18] Dr. Johnson noted that Plaintiff's then current treatment included lumbar epidural steroid injections, cervical epidural steroid injections, bilateral occipital nerve blocks, Percocet and Fentanyl patches,[19] and he described Plaintiff's clinical findings as "tenderness in occipital regions bilaterally, tenderness along paraspinal musculature of cervical spine and diffuse tenderness in lumbar spine region." Regarding Plaintiff's prognosis, the legible portion of Dr. Johnson's response indicated that Plaintiff's pain would continue, and that his range of motion and activities would continue to be decreased. (R. 379-83).

At the hearing before the ALJ, Plaintiff testified that he underwent surgery for deep vein thrombosis on September 24, 2006;[20] that he was treated for this condition by Dr. Samuel

---

[18]Dr. Johnson also noted that Plaintiff's significant medical history included diabetes and coronary artery disease.

[19]Fentanyl skin patches should only be used to control moderate to severe chronic (around the clock, long-lasting) pain that cannot be controlled by the use of other pain medications in people who are tolerant (used to the effects of the medication) to narcotic pain medications because they have taken this type of medication for at least one week. Fentanyl skin patches should not be used to treat mild pain, short-term pain, pain after an operation or medical or dental procedure, or pain that can be controlled by medication that is taken as needed. *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 4/17/2008).

[20]Deep venous thrombosis is a condition in which a blood clot forms in a vein that is deep inside the body. www.nlm.nih.gov/medlineplus/encyclopedia (last visited 4/17/2008).

17

McGee, who prescribed Coumadin;[21] and that in October 2006, he was compelled to undergo two additional surgeries in connection with the deep vein thrombosis for hematomas. (R. 415, 437-38). The administrative record does not include any medical records relating to Plaintiff's treatment by Dr. McGee for deep vein thrombosis, although the ALJ included this condition as one of Plaintiff's severe impairments.[22] (R. 15).

On October 3, 2006, Dr. Reinhardt, Plaintiff's family physician, completed a Medical Source Statement concerning Plaintiff's ability to engage in work-related physical activities. Dr. Reinhardt opined that Plaintiff could frequently lift or carry 25 pounds; that he could stand approximately 4 hours in an 8-hour workday; that his ability to sit was not affected by his impairments; that he could occasionally engage in all postural activities, *i.e.*, climb, stoop, kneel, balance, crouch and crawl; and that his ability to see (diabetes), to feel, to handle, and to push and pull were affected by his

---

[21]Coumadin is used to prevent blood clots from forming or growing in your blood and blood vessels. www.nlm.nih.gov/medlineplus/druginfo (last visited 4/17/2008).

[22]At the beginning of the hearing before the ALJ, counsel indicated that he had requested Plaintiff's treatment records from Dr. McGee and post-hearing development was discussed. (R. 415). At the conclusion of the hearing, the ALJ indicated that the record would be kept open "for a period of 15 days, possible extensions" for receipt of Dr. McGee's records. (R. 472). Apparently, Plaintiff's counsel was not successful in obtaining Dr. McGee's treatment records because they are not in the administrative file or referenced by the ALJ in his decision.

18

impairments. The medical findings supporting Dr. Reinhardt's opinions were described as Plaintiff's treatment for ischemic cardiomyopathy, coronary artery disease, diabetes and degenerative disc disease of the cervical spine. (R. 386-89).

Finally, at the hearing before the ALJ on November 17, 2006, Plaintiff testified that his then current medications included Percocet, Fentanyl patches, Coumadin, Doxepin, Insulin and Klonopin (Clonazepam).[23] (R. 433-35).

## IV. Legal Analysis

### A. Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C. § 405(g) and § 1383(c)(3) (incorporating § 405(g)), which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a

---

[23]Clonazepam is used to relieve anxiety. www.nlm.nih.gov/ medlineplus/druginfo (last visited 4/17/2008). Plaintiff testified that he started taking the Clonazepam, which had been prescribed by Dr. Reinhardt, a week before the hearing due to increased anxiety since his surgery for deep vein thrombosis. (R. 434-35, 443).

19

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

## B. The ALJ's Decision

In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1). A Social Security claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

In Burnett v. Commissioner of Social Security Admin., 220 F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure

20

an ALJ must follow in evaluating a claim for Social Security

disability benefits, stating in relevant part:

\*    \*    \*

In <u>Plummer</u>, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity.  20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial
gainful activity, the disability claim will be denied.
<u>Bowen v. Yuckert</u>, 482 U.S. 137, 140, 107 S.Ct. 2287,
2290-91, 96 L.Ed.2d 119 (1987).  In step two, the
Commissioner must determine whether the claimant is
suffering from a severe impairment.  20 C.F.R.
§ 404.1520(c).  If the claimant fails to show that her
impairments are "severe," she is ineligible for
disability benefits.

In step three, the Commissioner compares the
medical evidence of the claimant's impairment to a list
of impairments presumed severe enough to preclude any
gainful work.  20 C.F.R. § 404.1520(d).  If a claimant
does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and
five.  Step four requires the ALJ to consider whether
the claimant retains the residual functional capacity
to perform her past relevant work.  20 C.F.R.
§ 404.1520(d).  The claimant bears the burden of
demonstrating an inability to return to her past
relevant work.  <u>Adorno v. Shalala</u>, 40 F.3d 43, 46 (3d
Cir.1994).

If the claimant is unable to resume her former
occupation, the evaluation moves to the final step.  At
this stage, the burden of production shifts to the
Commissioner, who must demonstrate the claimant is
capable of performing other available work in order to
deny a claim of disability.  20 C.F.R. § 404.1520(f).
The ALJ must show there are other jobs existing in
significant numbers in the national economy which the
claimant can perform, consistent with her medical
impairments, age, education, past work experience, and
residual functional capacity.  The ALJ must analyze the

21

:

> cumulative effects of all the claimant's impairments in
> determining whether she is capable of performing work
> and is not disabled.

Plummer, 186 F.3d at 428.

\*    \*    \*

220 F.3d at 118-19.

With respect to the ALJ's sequential evaluation in the
present case, step one was resolved in Plaintiff's favor: that
is, the ALJ found that Plaintiff had not engaged in substantial
gainful activity since his alleged onset date of disability of
March 15, 2005.  (R. 15).  As to step two, the ALJ found that the
medical evidence established the following severe impairments:
degenerative disc disease of the cervical spine with tension
headaches and intermittent left leg peripheral vascular
insufficiency.  (R. 15).  Regarding step three, the ALJ found
that Plaintiff's impairments did not meet or equal the
requirements of any listed impairment in 20 C.F.R., Pt. 404,
Subpt. P, App. 1, and, in particular, Listing 1.04 relating to
disorders of the spine.  (R. 16).  Turning to step four, the ALJ
found that Plaintiff is capable of performing his past relevant
work as an automobile sales representative and a credit manager.
(R. 18-19).  Thus, Plaintiff was not disabled.[24]  (R. 19).

---

[24]If it is determined that a claimant is or is not disabled
at any step of the sequential evaluation process, the evaluation
does not proceed to the next step.  Accordingly, the ALJ in the
present case did not continue his analysis to step five.

## C. Discussion

Plaintiff's only argument in support of his motion for summary judgment relates to the ALJ's RFC assessment. Plaintiff contends that the ALJ's finding that he retained the RFC for medium exertion level work is not supported by any physician who was asked to render an opinion on his physical limitations, and, therefore, the ALJ's decision is not supported by substantial evidence and must be reversed. After consideration, the Court agrees with Plaintiff that the ALJ's finding of a RFC for medium work in this case is not supported by substantial evidence. However, there is substantial evidence in the record to support the ALJ's determination that Plaintiff could perform two of his past jobs, as well as other jobs existing in significant numbers in the national economy.

In the brief filed in support of his motion for summary judgment, Plaintiff asserts that the ALJ's finding of a RFC for medium work was "crucial to the determination that the Plaintiff could perform his past work, and the ultimate finding that he is not disabled." (Pl's Brief, p. 7). This argument is simply wrong. Plaintiff overlooks the fact that although the ALJ found that he retained the RFC to perform medium work with certain restrictions, the past jobs the ALJ ultimately concluded Plaintiff could perform were the jobs of an automobile sales representative and a credit manager which the VE classified as

23

:

light and sedentary exertion level jobs, respectively.[25] In
addition, the VE testified that even if Plaintiff could not
perform any of his past relevant work, he could perform the light
exertion level jobs of office helper and hostess/greeter and the
sedentary exertion level jobs of surveillance system monitor and
credit reference clerk (with a sit/stand option). Further, the
finding that Plaintiff retained the RFC for light and sedentary
work is supported by substantial evidence. Specifically, a
review of the Medical Source Statement provided by Dr. Reinhardt,
Plaintiff's long-time treating physician, establishes an ability
to perform light work,[26] and the report of the consultative
examiner, Dr. Dunmore, establishes an ability to perform

---

[25]Plaintiff's only past job that was classified as medium
work was the job of a sewer and drain cleaner, and the VE
specifically ruled out this job for Plaintiff due to its postural
requirements.

[26]Plaintiff argues that Dr. Reinhardt's opinion that he could
stand or walk about 4 hours in an 8-hour workday precludes light
work which requires "a good deal of walking." (Pl's Brief, pp.
7-8). The Court finds this argument unpersuasive. Moreover,
Plaintiff fails to acknowledge the fact that even if Dr.
Reinhardt's opinion precluded light work, the opinion clearly
supports a finding that Plaintiff could perform sedentary work.

24

sedentary work. Under the circumstances, the Court is compelled to affirm the decision of the ALJ.[27]

*William L. Standish*

William L. Standish
United States District Judge

Date: April 24, 2008

---

[27]Although the Court may have decided the case in Plaintiff's favor, as noted previously, an ALJ's decision must be affirmed if supported by substantial evidence.